Charles E. Hansberry
Jenny M. Jourdonnais
HANSBERRY & JOURDONNAIS, PLLC
2315 McDonald Ave., Suite 210
Missoula, MT 59801
Telephone (406) 203-1730
Chuck@HJBusinessLaw.com
Jenny@HJBusinessLaw.com


        Attorneys for Plaintiffs


        IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| JOEL LABUTE and JAL & JLL, LLC, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| KENNETH KRUPP, STAR COACH RACE TOURS, LLC, and BWS ALK, LLC, | **COMPLAINT** |
| Defendants. | |

    Plaintiffs Joel Labute ("Labute") and JAL & JLL, LLC ("JAL"), by and

through their counsel of record, Hansberry and Jourdonnais, PLLC, and for their

Complaint, states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Labute is a resident of and principally domiciled in Osceola County, Florida.

2.      JAL is a Montana Limited Liability Company whose sole member is Labute, a Florida citizen.

3.      Defendant Kenneth Krupp ("Krupp") is a resident of and principally domiciled in Kane County, Illinois.

4.      Defendant Star Coach Race Tours ("SCRT") is a Maryland Limited Liability Company whose sole member is Krupp, an Illinois citizen.

5.      Defendant BWS ALK, LLC ("BWS") is a Montana Limited Liability Company whose sole member is Krupp, an Illinois citizen.

6.      JAL, SCRT and BWS are all citizens of the states in which their sole members are citizens, Florida and Illinois respectively. *Johnson v. Columbia Props. Anchorage, LP*, 427 F.3d 894, 899 (9th Cir. 2006).

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds $75,000, exclusive of interests and costs and is between citizens of different states.

8.      Venue is properly in this Division pursuant to L.R. 3.2(b) and *Milanovich v. Schnibben*, 2007 MT 128, as it is the venue chosen by the parties in their contract.

## FACTS COMMON TO ALL COUNTS

➢ *FOUNDING AND GROWTH OF SCRT (2010-2021)*

9.      In January 2010, Labute founded SCRT to provide all-inclusive packages for NASCAR race fans at races throughout the United States.

10.      In 2011, Labute took on a minority partner in SCRT, Greg Atkinson. Labute was the majority (97.5%) managing member and Greg Atkinson ("Atkinson") was a minority (2.5%) member.

11.      Over the years, Labute grew SCRT into a successful business, with gross revenues in 2018 and 2019 in excess of $3.5 million.  While the outbreak of the Covid pandemic negatively impacted revenues, SCRT nevertheless had gross revenues of $2,809,863 in 2021.

12.      SCRT was an operational entity and did not own any buses or  other significant equipment.  Instead, the motorcoaches and other equipment were owned by JAL and leased to SCRT.

➢ *SALE OF SCRT TO KRUPP.*

13.      In 2021, Labute decided to sell SCRT and some (but not all) of JAL's equipment.  While SCRT was successful, running it required substantial time and intense effort that came at a cost to personal relationships.  In a post-pandemic

introspection, Labute was looking to downsize his business responsibilities and earn a living from passive rental income from JAL.

14.     Krupp, a personal acquaintance of Labute's, expressed an interest in purchasing SCRT.  However, before Labute would engage in negotiations for the sale of the business, he insisted that Krupp devote substantial time over three-and-a-half months accompanying him at work so that Krupp would understand the intense needs of the business before he purchased it.

15.     Labute employed a broker, Quest M&A, Inc., to facilitate and prepare any transaction documents for the sale.  Labute demanded that Krupp work through Quest M&A, Inc., instead of engaging in direct negotiations.

16.     A third-party valuation firm, GCF Business Valuation, appraised the fair market value of SCRT at $3,740,000 and the equipment to be sold at $1,381,500.  True and correct copies of the Appraisals are attached as Exhibit A and incorporated by reference.

17.     On August 17, 2022, Labute, Atkinson, Krupp, JAL, SCRT and BWS entered into several contracts relating to the same matters and composing parts of a single integrated transaction (the "Transaction").  The individual contracts memorializing the Transaction (the "Transaction Contracts") consisted of the following:

A.      An Interest Purchase Agreement (the "IPA") between Krupp and Labute and Atkinson, a true and correct copy of which is attached as Exhibit B and incorporated by reference.

B.      An Asset Purchase Agreement (the "APA") from JAL to BWS, a true and correct copy of which is attached as Exhibit C and incorporated by reference.

C.      A Star Coach Race Tours, LLC Lease Agreement (the "Bus Lease") between SCRT and JAL, a true and correct copy of which is attached as Exhibit D and incorporated by reference.

D.      A Garage (Parking) Lease Agreement (the "Garage Lease") between Labute and SCRT, a true and correct copy of which is attached as Exhibit E and incorporated by reference.

E.      A Promissory Note with a principal amount of $800,000 (the "800K Note") from Krupp to Labute, a true and correct copy of which is attached as Exhibit F and incorporated by reference.

F.      A Promissory Note with a principal amount of $130,000 (the "First $130K Note") from Krupp to Labute, a true and correct copy of which is attached as Exhibit G and incorporated by reference.

G.      Another Promissory Note  with a principal amount of $130,000 (the "Second $130K Note") from BWS to Labute, a true and correct copy of which is attached as Exhibit H and incorporated by reference.

18.     Under the IPA, Labute and Atkinson sold all of their membership interests in SCRT to Krupp for the purchase price of $3,705,000 payable as follows: (a) $2,775,000 in cash from a combination of third-party financing from Incredible Bank and guaranteed by the Small Business administration ("SBA") or $250,000 that Krupp represented was a gift from his mother-in-law; and (b) $930,000 in seller financing in the form of the $800K Note and the First $130K Note.  A true and correct copy of the Closing Statement from the Transaction is attached as Exhibit I.

19.     Under the APA, JAL sold specific equipment  (buses, trailers, trucks, golf carts and other equipment) (the "Equipment Collateral") to BWS for the purchase price of $1,295,000 payable as follows: (a) $1,165,000 in cash from a combination of third-party financing from Incredible Bank and guaranteed by the SBA or the $250,000 that Krupp represented was a gift from his mother-in-law; and (b) $130,000 in seller financing in the form of the Second $130K Note.

20.     Upon information and belief, Krupp pledged the Equipment Collateral as security for repayment of the SBA loan from Incredible Bank.

21.     Under the $800K Note, Krupp was to make interest-only payments for the first twelve months before then making principal and interest payments. However, if Krupp defaulted on his payments for a period of sixty-days after written notice, Labute could accelerate the entire outstanding amount which would then be immediately due and payable.  Under the First $130K Note and the Second $130K Note, Krupp and BWS were to make principal and interest payments until the entire amounts were paid in full.

22.     In order to provide Krupp and BWS flexibility to manage cash-flow, neither the First $130K Note nor the Second $130K Note had minimum periodic payments.  However, the expectation of the parties was that Krupp and BWS would make some principal and interest payments on both Notes in order to avoid accumulating interest and retire the debt.  However, like the $800K Note, if Krupp defaulted on his payments on either $130K Note for a period of sixty-days after written notice, Labute and JAL could accelerate the entire outstanding amount which would then be immediately due and payable.

23.     As part of the consideration for the Transaction, Labute agreed in Section 6.05 of the IPA to a covenant not to compete which prohibited him, or any company he controlled, from engaging in "a business in competition with, or similar to, all or any parts of *the Business* within the Territory," or to "solicit,

divert, encourage or attempt to call upon , any _Customers_" for a period of three years.  (emphasis added).

24.    The IPA narrowly defined the "Business" as "a business that promotes and sales _all-inclusive race tour packages_ to individual, groups and corporate clients" and "Customers" as a "customer or client of the Business at the time of, or during the twelve (12) month period prior to, the Closing Date." (emphasis added).

25.    As additional consideration for the Transaction, Labute agreed to provide consulting "assistance and unlimited telephone and email assistance" to SCRT for one year for compensation of $4,166.67 per month.

26.    In the Bus Lease, SCRT leased from JAL for a term of two years the following two separate categories of buses: (A) eight luxury motor coaches (the "Annual Lease Vehicles") for all-inclusive tours for the sum of $40,000 per month; and (B) seven additional motor coaches and motor homes (the "Elective Vehicles") on an as-needed basis and at then market rates.

27.    In the Garage Lease, SCRT leased from Labute for a term of two years space to store the Annual Lease Vehicles at property Labute owned in St. Cloud, Florida for the sum of $5,000 per month.

28.    All of the Transaction Contracts – specifically the payment terms and amounts therein – were vetted and approved in underwriting by both the SBA and

Incredible Bank to ensure that SCRT & Krupp could meet operational needs and service their debts based upon SCRT's historic revenues.

29.    The Transaction closed on August 17, 2022.

➢ *SCRT'S FIRST YEAR UNDER KRUPP'S OWNERSHIP.*

30.    Labute was highly incentivized to see that Krupp was successful in running SCRT so that Labute would transition out of any active role in the business.

31.    Notwithstanding the higher payment terms agreed by the parties in the Transaction Contracts, Labute decided to forbear select payments or charges to provide a financial cushion to SCRT to maximize the possibility of Krupp's success.

32.    By way of example, instead of the $40,000 monthly lease payment required under the Bus Lease, JAL only charged SCRT $26,500 for the Annual Lease Vehicles, the below-market rate that SCRT was paying prior to the closing of the Transaction.  This would free up $13,500 in additional cash-flow for SCRT.

33.    By way of another example, the Garage Lease only allowed for storage of Annual Lease Vehicles.  Nevertheless, Labute would routinely allow additional uses of the property (like housing of SCRT drivers, cleaning, and servicing of buses) without further compensation or rent in order to save SCRT expenses.

34.     Following the closing, at Krupp's request, Labute continued to assist Krupp with running SCRT.   However, the tasks Krupp asked Labute to continue to perform far exceeded the telephone and email consulting services contemplated by the parties in the IPA.  Labute continued to make sales and book tours, assist in setting up and running tours at NASCAR races.  Labute, a CPA, also maintained SCRT's books.

35.     Throughout the first year, SCRT's business continued to grow, with gross revenues of $3,979,834 for 2022, representing a complete rebound from the Covid pandemic and more than a ten percent increase from pre-Covid years.

36.     In 2023, SCRT had its best year ever, with gross revenues of $4,808,717, or 20% growth over 2022.

37.     Much of the continued growth in SCRT was due to Labute's extra-contractual efforts, as he was solely responsible for 86% of SCRT's new tour sales from October 2022 through June 2023.

38.     While Labute would try to transition new and existing clients to Krupp, multiple times they would return to Labute and indicate that they did not wish to engage in further business with Krupp.

39.     SCRT's business model revolves around demanding and detail-oriented customer service for (often) exclusive clientele.  Notwithstanding, Krupp would routinely ignore calls and communications from clients.

40.    Despite both the increase in gross revenues and the additional financial concessions provided by Labute/JAL to reduce expenses, SCRT still struggled to pay its bills to JAL, Labute and other third-party vendors and creditors.

41.    SCRT's lack of cash flow was attributable to poor management decisions and excessive non-business expenses by Krupp, including but not limited to: (a) paying his family members above market wages and fees; (b) excess personal meals, entertainment and travel; (c) excess temporary labor charges; (d) excessive repairs to vehicles due to lack of preventative maintenance; (e) paying non-deductible personal expenses, like mortgage payments, personal income tax and the purchase of personal vehicles; and (f) excessive interest charges on merchant cash advances (i.e. factoring agreements) from third-parties.

42.    Moreover, Krupp's representation that the $250,000 was a gift from his mother-in-law was false.  It was actually a loan which he agreed to repay at the rate of $5,000 per month, placing additional debt service burdens on SCRT that was unknown to Labute, Incredible Bank, and the SBA at the closing of the Transaction.

43.    SCRT's cash-flow problems were also hampered by Krupp's lack of urgency to send out contracts and finalize sales to keep revenue coming in in order to pay bills.

44.     Due to Krupp's mismanagement and SCRT's lack of cash flow, SCRT was in default on its obligations to JAL and Labute which necessitated not only additional concessions on those obligations, but also Labute and JAL making operational advances of its own funds and its own credit on behalf of SCRT to ensure that tours that were booked were adequately staffed and supplied.

45.     It was orally agreed, and customary by the parties, that any operational advances made by Labute and JAL would be repaid by SCRT first at the end of each month to avoid any interest expense.

46.     On September 4, 2023, at approximately the one-year anniversary of the closing of the Transaction, the parties executed an agreement to modify and amend their respective obligations under the Transaction Contracts (the "1-Year Modification"). A true and correct copy of the 1-Year Modification is attached as Exhibit J and incorporated by reference.

47.     The 1-Year Modification was effectively a "work-out" agreement with multiple purposes including: (a) to give Krupp and SCRT some additional monthly working capital; (b) to compel and incentivize Krupp and SCRT to start retiring their debts to Labute and JAL; and (c) to compel and incentivize Krupp and SCRT to fully transition all operational aspects of SCRT away from Labute and JAL.

48. Under the 1-Year Modification, the following amendments were made to the Transaction Contracts:

A. The interest-only period of the $800K Note was extended another twelve months.

B. Krupp and BWS agreed to start making monthly principal and interest payments totaling $5,000 on the First $130K Note and the Second $130K Note.

C. The monthly lease under the Bus Lease for the Annual Lease Vehicles was reduced to $30,000 per month with the stated purpose to "assist SCRT and BWS cash positions in the hope that SCRT and BWS will stockpile the $10,000/month rent reduction to improve credit profile and be able to buy additional buses from JAL."

D. SCRT would start paying an additional $5,000 per month towards its outstanding balance due under the Bus Lease, as well as keep its future monthly lease current.

E. SCRT would pay a $5,000/month "co-sign" fee where it was continuing to rely on Labute and JAL's credit for operational funds from other creditors (i.e., credit card merchant processing, American Express cards, Prevost Account).  Further, SCRT would start to establish its own, independent credit by September 15, 2023.

F.    SCRT would continue to pay Labute a monthly management consulting fee of $4,166.67/month, but would also pay him for the additional duties he was undertaking as follows: (1) $350/day for Labute's personal efforts at the racetracks for set-up and at-track activations; and (2) a sales commission for tours that were booked as a result of Labute's efforts.

G.    Notwithstanding, Labute would continue to work directly with Krupp to transfer sales relationships and duties in order to fully transition out of the business of SCRT.

➢ ***THE START OF SCRT'S SECOND YEAR UNDER KRUPP'S OWNERSHIP.***

49.    In order to further assist Krupp in running SCRT, he instituted a "Board of Directors" consisting of his brother Mike Krupp, Avi Katz, and James Dudek.

50.    Throughout the fourth quarter of 2023, Labute and JAL continued to provide operational advances to SCRT so that SCRT could continue to secure spots at upcoming races, provide tours and bring in revenue in an effort to pay creditors.

51.    From November 2023 through January 2024, SCRT would issue paychecks to its contractors (i.e., bus drivers) knowing that there were insufficient

funds to cover the checks.  Labute would advance SCRT  additional sums to cover the paychecks.

52.    By November 2023, SCRT & Krupp had defaulted on the terms of the 1-Year Modification by failing to make the Bus Lease Payments as agreed.

53.    Labute could forebear no longer.  On December 12, 2023, JAL issued a seven-day termination notice pursuant to Section 8.b of the Bus Lease (the "Demand Letter") indicating that the Bus Lease would be terminated unless all amounts due and owing were not immediately paid, future payments kept current and repairs and maintenance were not completed.  A true and correct copy of the Demand Letter is attached as Exhibit K and incorporated by reference.

54.    SCRT failed to cure the defaults of the Bus Lease and JAL terminated it on December 19, 2023.

55.    On January 7, 2024, the Parties executed a Lease Reinstatement Agreement, which was a last effort "work-out" agreement for the Parties to salvage the Transaction.  A true and correct copy of the Lease Reinstatement Agreement is marked as Exhibit L and incorporated herein by reference.

56.    Under the Lease Reinstatement Agreement, the Bus Lease would be reinstated provided that certain conditions precedent was met, including:

A.    Payment of $244,936 to JAL settle all Bus Lease payments then in the arrears and bring the lease current through the end of December 2023.

B.      Payment of $5,000 to Labute for the monthly rent under the Garage Lease.

C.      Payment of $15,000 to Labute for back-due compensation for his consulting and other services under the 1-Year Modification.

D.      Letters of intent were provided from two outside investors indicating their willingness to invest in SCRT and bring additional capital for future operations.

57.     In addition to the conditions precedent to reinstating the Bus Lease, the Lease Reinstatement Agreement further modified the terms of the Transaction by adding a number of "cancellation clauses" and other terms to the Transaction Contracts.  Specifically, the Lease Reinstatement Agreement provided that termination of the Bus Lease would automatically result in cancellation of the restrictive covenant in Section 6.05 of the IPA.

58.     SCRT and Krupp failed to meet all of the condition's precedent for reinstatement of the Bus Lease or the additional terms provided in the Lease Reinstatement Agreement.

➢    ***THE 2024 DAYTONA 500.***

59.     The Daytona 500 on February 19, 2024, is a popular NASCAR Race and is usually one of SCRT's busiest tours.

60.    Going into the Daytona 500, SCRT was insolvent, in that the sum of its debts were greater than all of its assets at a fair valuation.

61.    SCRT could not pay to reserve spots at the Daytona 500 and again asked Labute to advance additional credit to reserve those critical spaces to run its tours.

62.    On February 17, 2024, while on location and preparing for the race scheduled a few days later, Krupp asked Labute to attend a meeting with "a potential investor" for SCRT.

63.    Krupp's reason for the meeting was a false pretext, as Krupp had his Florida lawyer, Ashby Underhill, immediately confront Labute and threaten to sue him unless Labute paid Krupp $1.2 million and assume all of the other debts that Krupp had purchasing and unsuccessfully trying to run the business, including the SBA loan from Incredible Bank.

64.    Labute rejected Mr. Underhill's "demand" and asked Krupp whether he was going to timely meet his obligations under the Transaction Contracts as modified by the 1 Year Modification and the Lease Reinstatement Agreement.

65.    Krupp said no, neither he nor SCRT intended to make their payment obligations under the Transaction Contracts.

66.    Accordingly, in the evening of February 17, 2024, Labute and JAL issued a Master Lease Termination Notification in which it reiterated the terms

under the Lease Reinstatement Agreement, Krupp's and SCRT's default of the same, and provided notice that the Bus Lease would be canceled effective at 8 a.m. on February 20, 2024, the day after the running of the Daytona 500.

67.    Labute intentionally timed the Lease Termination Notification to be effective after the race in order not to disrupt SCRT's business at the Daytona 500.

68.    Following the issuance of the Lease Termination Notification, Labute met with Krupp, Mike Krupp, Avi Katz, and another creditor of SCRT, Mike Shelton.  The purpose of the meetings was to see if some kind of resolution could be reached in order for SCRT to continue to meet its obligations, particularly to Mr. Shelton who was owed approximately $500,000 by Krupp and SCRT.

69.    At approximately 11:30 a.m. on February 18, 2024, a meeting was held in Hospitality Coach 1 with Labute, Krupp, Mike Krupp, and Mike Shelton. At that meeting, Krupp and Labute orally agreed to the following:

A.    Labute/JAL and Krupp/SCRT would execute clean releases of all claims each had against the other.

B.    Labute/JAL would not pursue collection of any outstanding amounts under the Transaction Contracts.

C.    Labute/JAL would ensure that all staff and vendors SCRT had retained for the Daytona 500 would be paid in full.

D.     Using SCRT's infrastructure and funds from Mike Shelton,
       Labute/JAL would ensure that all customer obligations for the
       Daytona 500 were met.

E.     As the Bus Lease was terminated effective the day after the race, any
       on-going business between Labute/JAL and Krupp/SCRT was also
       terminated.

70.    Following the meeting, SCRT transferred customer deposits that were
in its account into JAL's account so that JAL could complete SCRT's customer
obligations for the Daytona 500.

71.    Labute and Krupp then met with the entirety of SCRT's staff in
addition to Mike Krupp and Mike Shelton at approximately noon at SCRT's cook
set up in turn 1 along the racetrack.  At that meeting, Krupp communicated to staff
that their tenure with SCRT was ending and that they would need to reapply with
JAL.  Krupp informed the staff that he would be leaving Daytona and that they
were to follow instructions by Labute.  Krupp expressed his thanks to Labute and
said he "was sorry it worked out this way."

72.    Krupp then left Daytona.

73.    In the days and weeks following Daytona, Krupp has informed clients
and customers who had booked tours that "[Labute] will make sure your bus is
there."

74.    Recently, however, Krupp (through his attorneys) has disclaimed the agreement he and Labute reached in Daytona.

## COUNT 1:  DECLARATORY RELIEF

75.    Plaintiffs reallege paragraphs 1-74 above.

76.    There presently exists a controversy among the Parties as to the current status of the parties' obligations under the Transaction Contracts and the resolution of any claims either has against each other.

77.    It is Plaintiffs' position that the parties' obligations under the Transaction Contracts obligations have been terminated in full and the Parties have agreed to release any claims that they have against each other.

78.    Upon information and belief, it is the Defendants' position that the Transaction Contract obligations continue to remain enforceable despite their continuing and ongoing default on their payment and other obligations therein and that the Parties continue to retain any claims that they have against each other.

79.    As a matter of Montana law, the ongoing obligations of the Transaction Contracts have been terminated by mutual consent of the Parties and each party has agreed to release and waive any claim that they have against each other.

80.    Alternatively, as a matter of Montana law, the restrictive covenant in Section 6.05 of the IPA, as modified by the 1 Year Agreement and the Lease

Reinstatement Agreement, has been terminated in full due to Defendants' default of the Bus Lease.

81.    As a matter of Montana law, the Defendants cannot enforce the restrictive covenant in Section 6.05 of the IPA due to their prior breach of the material terms of the Transaction Contracts.

82.    As a matter of Montana law, the Defendants cannot enforce the restrictive covenant in Section 6.05 of the IPA, due to the failure of the full consideration being provided for the covenant.

83.    As a matter of Montana law, the Defendants cannot enforce the restrictive covenant in Section 6.05 of the IPA as Defendants no longer have a legitimate business interest in enforcing the covenant.

84.    Alternatively, even if the restrictive covenant in Section 6.05 of the IPA is still enforceable, it is narrowly construed and limited by its express language to soliciting existing "Customers" as of the date of closing of the Transaction and providing "all-inclusive race tour packages" as those tours are described on the SCRT website and does not preclude Plaintiffs from soliciting new customers or JAL from renting buses for less than all-inclusive tours.

85.    Pursuant to 28 U.S.C. §2201, the Plaintiffs are entitled to a judicial declaration that either: (A) the Parties' respective obligations under the Transaction Contracts have been terminated and they have agreed to release any claims that

they have against each other; or (B) that the restrictive covenant in Section 6.05 of the IPA is not enforceable or is narrowly limited.

## COUNT 2:  BREACH OF CONTRACT

86.    Plaintiffs reallege paragraphs 1-85 above.

87.    As outlined above, if the Transaction Contracts have not been terminated and the parties have not agreed to waive claims, Defendants have been and continued to be in breach of their agreements.  Specifically, for purposes of this litigation:

A. Defendants are in default on their obligations to pay interest on the $800K Note.

B. Defendants are in default on their obligations to pay principal and interest on the First $130K Note and the Second $130K Note.

C. Defendants are in default of their obligations to pay Labute the agreed-to compensation for his consulting services.

88.    Defendants breach has caused the Plaintiffs to incur damages.

89.    Plaintiffs are entitled to judgment to compensate them for Defendants' breach in an amount to be proven at trial.

## COUNT 3:  BREACH OF ORAL CONTRACT/ UNJUST ENRICHMENT

90.    Plaintiffs reallege paragraphs 1-89 above.

91.    As outlined above, Defendants have been and continued to be in breach of their oral agreement to repay the Plaintiffs for operational advances Plaintiffs made in order for SCRT to maintain operations.

92.    Defendants breach of their oral agreement has caused the Plaintiffs to incur damages.

93.    Alternatively, Defendants would be unjustly enriched if they were able to retain the benefits of the operational advances made by Plaintiffs without repayment.

94.    Plaintiffs are entitled to judgment to compensate them for the unpaid operational advances in an amount to be proven at trial.

## COUNT 4:  APPOINTMENT OF A RECEIVER

95.    Plaintiffs reallege paragraphs 1-94 above.

96.    Plaintiffs are creditors of SCRT.

97.    SCRT's debts to Plaintiffs and other third parties far exceed its assets and it is currently insolvent.

98.    Plaintiffs have a probable right to and interest in the property and assets of SCRT.

99.    SCRT's remaining assets are in danger of being lost, removed, or materially injured.

100.    Pursuant to Montana Code Annotated §27-20-102(2), Plaintiffs are entitled to have a receiver appointed for SCRT for the purpose of maintaining and managing its remaining assets for the pendency of this litigation and until further resolution of the Court.

### PRAYER FOR RELIEF

Having set forth its Complaint, Plaintiffs respectfully pray for relief and for entry of judgment as follows:

1.    That the Court issue judgment in the Plaintiffs' favor, declaring that any ongoing obligations of the Parties in the Transaction have been terminated in full no later than February 20, 2024, and that the Parties have agreed to release and waive any claim that they have against the other.

2.    That, alternatively if the Transaction Contracts have not been terminated, a judicial declaration that the restrictive covenant in Section 6.05 of the IPA is not enforceable or is narrowly limited to existing Customers as of August 17, 2022, and only to all-inclusive tours as offered by SCRT on its website.

3.    That the Court issue judgment in Plaintiffs' favor, awarding them damages to compensate Plaintiffs for Defendants' breach of the identified Transaction Contracts.

4.    That the Court issue judgment in Plaintiffs' favor, awarding them damages to compensate Plaintiffs for Defendants' breach of the oral agreement to

repay operational advances made, or in the alternative, to grant equitable restitution for Defendants' unjust enrichment in retaining the operational advances without repayment.

5.     That the Court appoint a receiver for SCRT during the pendency of this action to maintain and preserve the remaining assets of the company for the benefit of Plaintiffs and other competing creditors.

6.     That the Court award Plaintiffs any other legal and equitable relief that this Court deems just and proper.

DATED this 26th day of March, 2024.

Attorneys for Plaintiff:

HANSBERRY & JOURDONNAIS, PLLC
2315 McDonald Ave., Suite 210
Missoula, MT   59801

By   /s/ Charles Hansberry
CHARLES E. HANSBERRY

By   /s/ Jenny M. Jourdonnais
JENNY M. JOURDONNAIS