## INTEREST PURCHASE AGREEMENT

THIS INTEREST PURCHASE AGREEMENT (this **"Agreement"**), dated as of August <u>17</u>, 2022 ("**Effective Date**"), is entered into by and among Kenneth Krupp, a resident of the State of Illinois ("**Buyer**") and Joel Labute, a resident of the State of Florida ("**Labute**") and Gregory Atkinson, a resident of the State of Maryland ("**Atkinson**" and collectively with Labute the "**Sellers**").

### R E C I T A L S

WHEREAS, Labute is a member who owns ninety seven and one half percent (97.5%) of the interest (the **"Labute Interest"**) and the sole manager and Atkinson is a who owns two and one half percent (2.5%) of the interest (the **"Atkinson Interest"** and collectively with the Labute Interest, the "**Interest**") in Star Coach Race Tours LLC, a Maryland limited liability company (the **"Company"**); and

WHEREAS, Sellers wishes to sell to Buyer, and Buyer wishes to purchase from Sellers, the Interest, subject to the terms and conditions set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Sellers hereby assigns, sells and transfers to Buyer, and Buyer hereby purchases from Sellers, all of Sellers' right, title and interest in and to the Interest, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance (**"Encumbrance"**), for the consideration specified in **Section 1.02**.

**Section 1.02 Purchase Price.** The purchase price (the "**Purchase Price**") for the Interest shall be Three Million Seven Hundred Five Thousand and No/100 Dollars ($3,705,000). Buyer shall pay the Purchase Price to Sellers as follows: (a) at Closing, Buyer shall pay to Sellers Two Million Seven Hundred Seventy Five Thousand and No/100 Dollars ($2,775,000) by wire transfer of immediately available funds to an account designated in advance by Sellers and allocated among the Sellers based on their ownership percentage of the Interest, and (b) issue promissory notes to Labute, with the first being in the principal amount of Eight Hundred Thousand and No/100 Dollars ($800,000.00) and in the form set forth in Exhibit A and the second being in the principal amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000) and in the form set forth in Exhibit A (the "**Notes**") along with personal guaranty by Kenneth Krupp and second security lien securing payment of the Notes.

**Section 1.03 Closing.** The closing of the transactions contemplated by this Agreement (the **"Closing"**) shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the **"Closing Date"**) by the electronic exchange of documents. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 1.04 Transfer Taxes.** Sellers shall pay, and shall reimburse Buyer for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

**Section 1.05 Withholding Taxes. Company's Bank Accounts**. At the Closing, Labute shall cause the Company to grant Buyer and its designees signatory power and, if requested, the sole power to issue instructions relating to those certain bank accounts identified on <u>Schedule 1.05</u> of this Agreement into which deposits for accounts receivable and other rights of payment for goods and services provided by the Business are made.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES OF SELLERS AND COMPANY**

The Sellers, jointly and severally, unless otherwise referenced to one of the Sellers, represent and warrant to Buyer that the statements contained in this **Article II** are true and correct as of the Closing Date.

**Section 2.01 Organization of Company and Authority of Sellers; Enforceability.**

(a)     Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Maryland. The Company has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by the Sellers, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

(b)     The Interest represent a one hundred percent (100%) Interest in the Company. The Company is not a party to any contract containing any profit participation features, equity appreciation rights, options, or similar contracts that allow any person to participate in the equity of the Company.  There are no interests in the Company currently reserved for issuance for any purpose or upon the occurrence of any event or condition.  Except for this Agreement, there are no existing contracts or options between Sellers or the Company and any other person regarding the Interest.  At Closing, other than the Operating Agreement of the Company, dated February 4, 2010 (collectively the "<u>Operating Agreement</u>") there will be no contracts between the Sellers or the Company and any other person(s) that is binding upon Sellers or the Company with respect to the voting, transfer, encumbrance of interests in the Company or to acquire interests in the Company or securities that are exchangeable or convertible into interests in the Company or with respect to any aspect of the Company's governance or distributions.

(c)     Sellers are the sole legal, beneficial, record and equitable owner of the Interest, free and clear of all Encumbrances whatsoever. Sellers have the right, power and authority to enter into this Agreement and the agreements contemplated hereby and to consummate the transactions contemplated hereby and thereby including, among other things, to sell and deliver the Interest free and clear of all Liens and other encumbrances.  Upon Sellers' execution and delivery of this Agreement and each other agreement contemplated hereby, this Agreement and each such other agreement will constitute the legal, valid and binding obligation of Sellers, as applicable, enforceable against Sellers in accordance with their respective terms. The Interest were issued in compliance with applicable laws. The Interest were not issued in violation of the organizational documents of the Company or any other agreement, arrangement or commitment to which Sellers or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any person.

**Section 2.02 Title to Interest**.  The Interest owned by Sellers are duly authorized, validly issued, fully paid and nonassessable, are free and clear of all Encumbrances, and have been issued in compliance with all applicable securities laws.  All of the Interest were acquired in compliance with all applicable regulations, free and clear of any rescission and Contract rights.  There are no outstanding options,

2

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

warrants, rights, calls, commitments, conversion rights, rights of exchange, plans or other agreements of any character providing for the purchase or sale of any of the Interest, other than as contemplated by this Agreement. At Closing, Sellers will transfer and convey, and the Buyer will acquire, good, valid and marketable title to the Interest, free and clear of all Encumbrances and claims of every kind, except for those restrictions set forth in the Operating Agreement.

**Section 2.03 No Conflicts; Consents.** The execution, delivery and performance by the Sellers and the Company of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational documents of the Company; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers or the Company; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Sellers or the Company is a party; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents or the Operating Agreement; or (e) result in the creation or imposition of any Encumbrance on the Interest. No consent, approval, waiver or authorization is required to be obtained by Sellers from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by the Sellers and the Company of this Agreement and the consummation of the transactions contemplated hereby.

**Section 2.04 Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Sellers' actual knowledge, threatened against or by Sellers or the Company (a) relating to or affecting the Interest; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Sellers' actual knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such action. Neither the Sellers nor the Company have brought or to Sellers' actual knowledge are planning to bring any action against any third party. Neither Sellers nor the Company is subject of any governmental order (nor to the actual knowledge of a Sellers, are there any such governmental orders threatened to be imposed by any governmental authority).

**Section 2.05 Financial Statements.** True, correct and complete copies of the unaudited balance sheet and statements of operations, of the Company as of and for the fiscal year ended December 31, 2021 and the Company's unaudited consolidated balance sheet and statements of operations as of and for the five months ended May 31, 2022 (the "**Interim Financial Statements**") (collectively, the "**Financial Statements**") are attached as <u>Schedule 2.05</u> hereto. The Financial Statements (i) have been prepared based on the books and records of the Company (which are true and correct in all material respects), and (ii) present fairly the financial position of the Company as of the respective dates and the results of operations and changes in cash flow of the Company for the periods covered thereby (subject, in the case of the unaudited Interim Financial Statements, to normal year-end adjustments consistent with prior periods). Since May 31, 2022 (the "**Interim Balance Sheet Date**"), except as required by applicable Law, there has been no change in any accounting principle, procedure or practice followed by the Company or in the method of applying any such principle, procedure or practice.  The Company has no liabilities of any nature, whether accrued, absolute, contingent, matured, unmatured or otherwise, other than (i) liabilities identified as such in the "liabilities" line of the Financial Statements, (ii) accounts payable or accrued salaries and other employee compensation that have been incurred by the Company since the Interim Balance Sheet Date in the ordinary course of business and consistent with such Company's past practices, (iii) liabilities under the Company contracts that are expressly set forth in and identifiable by reference to the text of such Company contracts, and (iv) liabilities for taxes not yet due.

**Section 2.06 Title to Properties and Assets; Liens.** The Company has good and marketable title to all the respective properties and assets owned by it, including, without limitation, to Sellers' actual knowledge, all of the Intellectual Property (hereafter defined) used in its business, email lists and press contacts, and, in the case of property held by the Company under lease or license, a valid and

enforceable right to use such property, free and clear of any and all Encumbrances. All tangible assets are set forth in Schedule 2.06.

**Section 2.07 Tax Matters.** The Company has filed all required federal and state property, income and franchise tax returns when required and has paid all taxes shown (or required to be shown) as due thereon or otherwise owed by it to any taxing authority except those contested in good faith. There is no tax deficiency which has been or, to the best of the Sellers' actual knowledge, might be asserted against the Company which would materially affect the business or operations of the Company. All taxes of any applicable jurisdiction due and payable by the Company or for which the Company is liable for tax years or periods ending on or before the Closing Date have been or will be timely and properly paid. No claim has been made by a governmental entity in a jurisdiction where the Company has never paid taxes or filed tax returns that the Company is or may be subject to taxation by that jurisdiction. All taxes, which the Company is required by law to withhold or to collect for payment, have been duly withheld and collected and have been paid to the appropriate governmental entity. The Company has collected applicable sales and use and similar taxes and remitted such taxes to the relevant governmental entity. There are no liens for taxes upon any of the properties and assets of the company except liens for current taxes not yet due and payable.

**Section 2.08 Intellectual Property.** The Company owns, free and clear of all Encumbrances, and has the right to use, all Intellectual Property (as defined below) used by it in its business as currently conducted. To Sellers' actual knowledge, no other person or entity has any rights to any of the Intellectual Property owned or used by the Company, and, to the best of the Sellers' actual knowledge, no person or entity is infringing, violating or misappropriating any of the Intellectual Property owned by or licensed to the Company. For purposes of this Agreement, "Intellectual Property" means all (i) patents and patent applications, (ii) copyrights and registrations thereof, (iii) computer software, data and documentation, (iv) trade secrets and confidential business information, whether patentable or unpatentable and whether or not reduced to practice, know-how, research and development information, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (v) trademarks, service marks, trade names, domain names (including, but not limited to, the URL's set forth in Schedule 2.08 and applications and registrations therefor), and (vi) any other proprietary rights or information relating to any of the foregoing. The Company has not received any written complaint, claim or notice alleging any infringement, violation or misappropriation of any Intellectual Property of any other person or entity, and, to the best of the Sellers' actual knowledge, there is no reasonable basis for any such complaint, claim or notice. Except for the development work on the Company's Intellectual Property performed by Sellers, all of the Company's Intellectual Property has been created by employees of the Company within the scope of their employment by the Company or by independent contractors of the Company who have executed agreements expressly assigning all of their rights, title and interest in such Intellectual Property to the Company.

**Section 2.09 Brokers.** Except for Quest M&A, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

**Section 2.10 Employees**. Except for Labute, the Company has no employees. The Company has no Employee Benefit Plans, which are currently maintained and/or sponsored by the Company, or to which the Company currently contributes, or has or has had an obligation to contribute in the past, present or future (including, any such Plan or arrangement created by any Contract) or with respect to which the Company could have any liability, directly or indirectly, or through an ERISA Affiliate of the Company. The Company has no liability with respect to any benefit plans or arrangements other than the Plans.

**Section 2.11 Compliance with Law and Permits**. The Company has operated in compliance with regard to its operations, practices, and other property, employees, products and services and all other aspects of its business, with all applicable governmental regulations and orders. There are no claims

Ex B- IPA

pending, or the actual knowledge of Sellers, threatened, nor has the Company nor the Sellers received any written notice, regarding any violations of any regulations or orders enforced by any authority claiming jurisdiction over the company. The Permits listed on <u>Schedule 2.11</u> hereto are the only permits that have been required for the company to conduct its business in accordance with applicable regulations and orders of any authority. The Company has duly and validly held all such Permits, and each such Permit has been in full force and effect and, to the actual knowledge of Sellers, no suspension or cancellation of any such Permit is threatened and there is no basis for believing that such Permit will not be renewable upon expiration.

**Section 2.12 Absence of Certain Changes.** Since the Interim Balance Sheet Date, there has not been any (a) material adverse change in the Company's business, operations, properties, assets, condition (financial or otherwise) or results of the Company; (b) damage, destruction or loss, whether covered by insurance or not, having a cost of $1,000 or more, with regard to the Company's property and business; (c) declaration, setting aside or payment of any dividend or distribution (in respect of the Company's Interest, except for distribution of certain assets to the Sellers immediately prior to Closing and the redemption; (d) entry into any material contract not in the ordinary course of business, including without limitation, any borrowing from any new lender or in excess of the existing credit limits; (e) failure to promptly pay and discharge current liabilities or agree with any party to extend the payment of any current liability, which are not disputed in good faith; (f) sale, assignment, transfer, lease, license or otherwise placement of an Encumbrance on any of the Company's tangible assets, except in the ordinary course of business consistent with past practice, or canceled any material debts or Claims; (g) sale, assignment, transfer, lease, license or otherwise placement of a Lien on any Intellectual Property Rights or other intangible assets, disclosure of any material confidential information to any Person or abandoned or permitted to lapse any Intellectual Property Rights; or (h) agreed, whether orally or in writing, to do any of the foregoing.

**Section 2.13 Contracts.** <u>Schedule 2.13</u> hereto lists each of the following currently effective Contracts, arrangements and agreements (including oral agreements) of the Company (the "**Contracts**"), including without limitation:

(i) each broker, distributor, subcontractor, consulting, sales, commission, and advertising Contract or agreement to which the Company is a party;

(ii) each management Contract or Contract with independent contractors or consultants (or similar agreements) to which the Company is a party;

(iii) each Contract or agreement relating to indebtedness of the Company (including indebtedness to be paid in connection with Closing);

(iv) each Contract or agreement that limits or purports to limit the ability of the Company to compete in any line of business or with any Person or in any geographic area during any period of time, or which restricts the Company from hiring or soliciting for hire any individual or group of individuals;

(v) each Contract or agreement between or among the Company, on the one hand, and Sellers, and Company, on the other hand;

(vi) each lease agreement or agreement under which the Company is the lessor or sublessor of or permits any Person to occupy, hold or operate any real or personal property owned or controlled by the Company;

(vii) any assignment, license, indemnification or agreement with respect to any form of intangible property other than licenses of generally available commercial off-the-

shelf software, including, without limitation, any Intellectual Property or Confidential Information;

(viii)    any contract, agreement or understanding relating to the acquisition or disposition of any operating business or the capital stock of any other Person;

(ix)    each contract or agreement providing for benefits under any Plan; and

(x)    all other Contracts, agreements and arrangements, whether or not made in the ordinary course of business, which are material to the Company or the conduct of the Company's business, or the absence of which would have a material adverse effect.

Except as set forth in Schedule 2.13, each Contract: (i) is valid and binding on the Company and, to the actual knowledge of Sellers, each other party thereto, and is in full force and effect, and (ii) upon consummation of the transactions contemplated by this Agreement and each other agreement contemplated hereby, shall continue in full force and effect without penalty or other materially adverse consequence. The Company is not in breach of or default under any Contract. No consent or approval of any party to a Material Contract is required to be obtained by Sellers or the Company in connection with the consummation of the transactions contemplated hereby which has not already been obtained. To the actual knowledge of Sellers, no other party to a Contract is in breach thereof or default thereunder and none of Sellers or the Company has received, or is aware of any basis for or expects to receive during the following 12-month period, any notice of termination, cancellation, breach or default under any Contract. Sellers has made available to Buyer true and complete copies of all material Contracts.

**Section 2.14 No Other Representations and Warranties**. Except for the representations and warranties contained in this Article II (including the related portions of the Disclosure Schedules), neither Sellers nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers, including any representation or warranty as to the accuracy or completeness of any information regarding the Interest and the Company furnished or made available to Buyer and its Representatives (including any information, documents or material delivered to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby or any representation or warranty arising from statute or otherwise in law.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this **Article III** are true and correct as of the Closing Date

**Section 3.01 Authority of Buyer; Enforceability.** Buyer has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the Sellers) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 3.02 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) violate or conflict with any

Ex B- IPA

judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.03 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**ARTICLE IV**
**CLOSING DELIVERIES AND CONDITIONS**

**Section 4.01    Sellers' Deliveries.** At the Closing, Sellers shall deliver to Buyer the following:

(a)    copies of the resignation or resignations of Sellers, as the case may be, as a manager or officer of the Company, such resignation to be effective as of the date hereof.

(b) executed copies of each of the consents, approvals, or authorizations necessary for the consummation of the transactions set forth herein; and

(c) all other documents and items that may be reasonably requested by the Buyer in order to consummate the transactions contemplated hereunder.

**Section 4.02 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Sellers:

(a)    The Purchase Price;

(b)    the Notes executed by Buyer along with any security related documents; and

(c)    all other documents and items that may be reasonably requested by Sellers in order to consummate the transactions contemplated hereunder.

(d)    An Amended and Restated Operating Agreement between the Company and Buyer.

**Section 4.02 Conditions to Buyer's Obligation to Close.**  Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions:

(a) receipt of this Agreement, or a counterpart hereof, executed by the Company and Sellers;

(b) receipt of a certificate issued by the Maryland Secretary of State evidencing the good standing of the Company and certificates issued by the appropriate Secretary of State evidencing the good standing of the Company in Maryland, in each case, as of a date not more than fifteen (15) days prior to the Closing Date;

(c)  receipt of any and all consents, approvals, orders, permits or other authorizations required by all applicable regulations, orders and Contracts involving Sellers or the Company or binding on the Company's properties and assets, with respect to the execution, delivery and performance of the Agreement and the agreements contemplated hereby, and consummation of the transactions contemplated

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

hereby and the conduct of the business of the Company in the same manner after the Closing Date as before the Closing Date;

(d) receipt of the Amended and Restated Operating Agreement executed by Buyer; and

(e) receipt of resignations from the Sellers, immediately prior to the Closing Date.

**Section 4.04 Conditions to Sellers' Obligation to Close**.  Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver of the following conditions:

(a) receipt of this Agreement, or a counterpart hereof, executed by the Buyer.

(b) receipt of payment of the cash Purchase Price; and

(c) receipt of the executed Notes.

# ARTICLE V
# TAX MATTERS

**Section 5.01 Allocation of Company Income and Loss.** Buyer and Sellers shall request that the Company allocate all items of Company income, gain, loss, deduction or credit attributable to the Interest for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date in accordance with Treasury Regulation Section 1.706-1(c)(2).

**Section 5.02 Tax Filings.** The Sellers shall prepare and timely file, or shall cause to be prepared and timely filed, all tax returns in respect of the Company that are required to be filed (taking into account any extension) for all periods prior to the Closing Date. Such tax returns shall be filed in a manner consistent with the mutual understanding and agreement of Sellers and Buyer. At least fifteen (15) business days prior to the due date (taking into account all extensions) for the filing of each such tax return, Sellers shall deliver such tax return to the Company for its review, and shall make such revisions to such tax return as are requested by the Company.

**Section 5.03 Section 338(h)(10) Election**.

(a)    Sellers and Buyer shall join in making, and shall take any and all action necessary to effect, a timely and irrevocable election with respect to Company under Section 338(h)(10) of the Code (and the Treasury Regulations and administrative pronouncements thereunder) and any comparable or similar provision of applicable state or local Law to treat as an acquisition of assets (each, a "**Section 338(h)(10) Election**") the purchase and sale of the Interest.  Sellers and Buyer shall cooperate fully with each other in the making of each Section 338(h)(10) Election. Sellers and Buyer shall file all applicable tax Returns in a manner consistent with the Section 338(h)(10) Election, and shall not take any position or action contrary thereto.

(b)    Sellers shall include any income, gain, loss, deduction, or other tax item resulting from the Section 338(h)(10) Election on their tax Returns to the extent required by applicable Law. Sellers shall pay any income taxes imposed under Section 1374 of the Code on Company that is attributable to the making of the applicable Section 338(h)(10) Election.

(c)    At the Closing, or at any such later time reasonably requested by Buyer, Sellers shall deliver to Buyer two duly executed (by Sellers) and completed copies of Internal Revenue Service Form 8023 with respect to Company (each, a "**Form 8023**") and, as applicable, two duly executed (by Sellers) and completed copies of any analogous forms required pursuant to comparable or similar provisions of applicable

state or local Law with respect to Company. At the Closing, Buyer shall provide Sellers with the information regarding Buyer necessary to enable Sellers to complete the Forms 8023 and any analogous state or local forms.

(d)    Buyer may, with the prior written consent of Sellers, choose not to make a Section 338(h)(10) Election with respect to Company, in which case this Section 5.03 shall not apply with respect to Company.

(e)    Company will not be liable for any tax under Section 1374 of the Code or any corresponding or similar provision of state or local Law in connection with any deemed sales of assets of Company caused the Section 338(h)(10) Election, if any.

**Section 5.04 Aggregate Purchase Price Allocation**. The allocation of the Purchase Price among the assets of the Company shall be made by mutual agreement between Sellers and Buyer in accordance with Sections 338 and 1060 of the Code and any comparable or similar provisions of state, local or foreign law, as appropriate. The parties agree to adhere to such allocation in all reports, returns and other documents filed with any Governmental Body. Sellers and Buyer will fully comply with Section 1060 of the Code, including filing Form 8594 with its federal income tax Return for the taxable year that includes the date of Closing.

# ARTICLE VI
# COVENANTS

**Section 6.01 Prior rights.** Sellers hereby agrees that it will not assert any rights to any Intellectual Property, discoveries, concepts or ideas, or improvements thereof or know-how related thereto, as having been made or acquired by Sellers or any Sellers related to Intellectual Property of the Company as of or after the Closing Date, and not otherwise covered by the terms of this Agreement.

**Section 6.02 General.** Each of the parties will use their reasonable effort to take all action and do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement. Such actions shall include the transition of the services and relationships with clients to the Buyer including all billable time, invoices and other paperwork associated with the Business. Sellers and Buyer shall use their best reasonable efforts to obtain the authorizations, consents, orders and approvals necessary for their execution and delivery of, and the performance of their obligations pursuant to, this Agreement, including, without limitation, the consents required by this Agreement If any consent, approval or authorization necessary to preserve any right or benefit under any contract to which Sellers is a party is not obtained prior to the Closing, the Sellers shall, subsequent to the Closing, cooperate with Buyer in attempting to obtain such consent, approval, or authorization as promptly thereafter as practicable. If such consent, approval, or authorization cannot be obtained, the Sellers shall use its reasonable best efforts to provide the Buyer with the rights and benefits of the affected contract for the term thereof, and, if the Sellers provide such rights and benefits, the Buyer shall assume all obligations and burdens thereunder.

**Section 6.03 Public Announcements**. None of the parties shall publish, issue or make any press release or make any other public announcement concerning this Agreement or the transactions contemplated hereby except with the participation and consent of all parties; provided, however, that nothing contained in this Agreement shall prevent any party, after notification to the other parties to the extent legally permissible, from making any announcement or publication required by applicable law or from making any filings with governmental authorities that, based on advice of legal counsel, are required in connection with the execution and delivery of this agreement or the consummation of the transactions.

**Section 6.04 Further Assurances**. From time to time after the Closing Date, upon the reasonable request of any party hereto, the parties hereto shall execute and deliver or cause to be executed and delivered such further instruments of contribution, assignment, transfer, acceptance and assumption, and take such further action any party hereto may reasonably request in order to fully effectuate the purposes,

terms and conditions of this Agreement.

### Section 6.05 Restrictive Covenants

a.      **Definitions**.

"**Business**" means a business that promotes and sales all-inclusive race tour packages to individual, groups and corporate clients.

"**Customer**" means any person or entity who is or was a customer or client of the Business at the time of, or during the twelve (12) month period prior to, the Closing Date.

"**Restricted Period**" means the period commencing on the Closing Date and ending three (3) years after such date, provided, however, that this period will be tolled and will not run during any time that each Sellers is in violation of this provision, it being the intent of the parties that the Restricted Period will be extended for any period of time in which that each Seller is in violation of this provision.

"**Territory**" means means in recognition that this is a nationwide business, the United States of America.

b.      **Non-competition**. During the Restricted Period, each Seller shall not directly or indirectly either by either Seller personally or through any entity owned or managed in whole or in part by them (ownership does not mean holding less than 5% of stock in a publicly traded company) establish, own, manage, operate, finance or control, or participate in the establishment, ownership, management, operation, financing or control of, or be a director, manager, officer, employee, associate, consultant, agent, representative or independent contractor in a business in competition with, or similar to, all or any parts of the Business within the Territory.

c.      **Non-Solicitation of Customers**. Each Seller, pursuant to the acknowledgments set forth in subsection (a), during the Restricted Period, agree not to solicit, divert, encourage or attempt to call upon, any Customers, vendors or suppliers of Buyer in an effort to provide for purposes of marketing, selling, or providing products or services to such Customer which are substantially similar to or competitive with those offered by the Business or obtaining products or services similar to those received by the Business.

d.      **Non-Disparagement.** The parties hereby agree that, during the Restricted Period, no party will without prior written consent of the other party, make any statements, written or oral, regarding this Agreement or make any statement (including to any media source) that would disrupt, impair or affect adversely either party, or their owners, officers or directors, or place a party or such individuals in any negative light.

e.      **Non-Disclosure of Confidential Information**. The Sellers agree that they will not at any time use or disclose to any person (other than the other party or without the written consent of the other party) any Confidential Information of Buyer or the Sellers' Business. "**Confidential Information**" means any secret or confidential information concerning the business and affairs of the Business, including, but not limited to, methods and processes utilized by the Buyer to conduct Business, current and prospective customers, placement candidate and temporary employee listings, historical, current and anticipated customer requirements, pricing information, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, past, current, and planned research and development, current and planned marketing and service methods and processes,  market studies, business plans, computer software and database technologies, systems, structures and architectures (and related processes, formulae, composition, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information),

Ex B- IPA

information concerning legal affairs and any information, in any form, that is a trade secret.

      f.    **Rights and Remedies Upon Breach.**  If any party breaches or threatens to commit a breach of any of the Restrictive Covenants set forth in this Section 10, the non-breaching party shall have the following rights and remedies, each of which rights and remedies shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available under law or in equity: (i) the right and remedy to have the Restrictive Covenants specifically enforced (without posting any bond) by any court having equity jurisdiction, including the right to any entry for restraining orders and injunctions (preliminary, mandatory, temporary and permanent) against violations, threatened or actual, and whether or not then continuing, of such covenants, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the non-breaching party and that money damages alone will not provide adequate remedy; and (ii) the right and remedy to require the breaching party to account for and pay over to the non-breaching party all compensation, profits, monies, accruals, increments or other benefits derived or received by a breaching party as a result of any transactions constituting a breach of any of the Restrictive Covenants.  If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provisions and, in its reduced form, such provision shall then be enforceable and shall be enforced.

      **Section 6.05 Release.**  Each Seller for himself and his agents, personal representatives, executors, trustees, beneficiaries, administrators, heirs, successors and assigns, hereby waives, releases, covenants not to sue, and forever discharges Company and each of its individual, joint or mutual, past, present and future representatives, members managers, affiliates, shareholders, officers, directors, employees, successors and assigns (collectively, the "**Releasees**") from any and all proceedings, causes of action, orders, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, that each such Seller now has, have ever had or may hereafter have against one or all of the Releasees for, upon or by reason of, any matter, cause, event or thing whatsoever occurring at any time prior to the Closing Date, including any rights to indemnification or reimbursement from the Company; provided, however, that nothing contained herein shall operate to release any obligations of Buyer arising under this Agreement.

      **Section 6.06 Labute Consulting Engagement**. Labute hereby agrees to provide consulting services to the Company to assist the Company in an orderly transfer and delivery of services for the Business for a period of, and in no circumstances not to exceed, one (1) year  by providing assistance and unlimited telephone and email assistance for which the Company will pay $4,166.67 per month for such assistance at the end of each full or partial month after the Closing.

**ARTICLE VII**
**INDEMNIFICATION**

      **Section 7.01 Survival of Representations and Warranties**. All of the representations, warranties, covenants and agreements made by the parties shall survive the Closing for a period of one (1) year; *provided however*, that ((i)) the representations, warranties, covenants and agreements in Sections 3.01 through Section 3.05 shall survive until sixty (60) days following the expiration of the applicable statute of limitations (collectively, the "**Fundamental Representations**"), and all claims related to fraud criminal actions or intentional misconduct shall survive indefinitely.

      **Section 7.02 Buyer Indemnification**. Subject to the other terms and conditions of this Article VII, Sellers, jointly and severally (the "**Sellers Indemnifying Party**") shall indemnify and defend Buyer and its officers, members, managers, employees, agents and representatives ("**Representatives**") (Buyer and its Representatives collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, actual out-of-pocket costs or expenses of whatever kind, including reasonable attorneys' fees

and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers ("**Losses**") incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of or with respect to: (i) any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Sellers pursuant to this Agreement;  and (ii) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Sellers conducted, existing or arising on or prior to the Closing Date.

**Section 7.03** Sellers Indemnification. Subject to the other terms and conditions of this Article VII, Buyer ("**Buyer Indemnifying Party**") shall indemnify and defend Sellers and their Representatives (Sellers and their Representatives collectively, the "**Sellers' Indemnitees**") against, and shall hold each of them harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Sellers' Indemnitees based upon, arising out of or with respect to: (i) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; and (iii) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Buyer conducted, existing or arising after the Closing Date.

**Section 7.04 Limitations.** Except as to the Fundamental Representations and for any claims arising from Fraud or intentional misconduct, no Indemnifying Party shall be liable to the Indemnified Party until the amount of all Losses in respect to an indemnified claim under this Article VII exceeds $5,000 (the "**Deductible**"), in which case the Indemnifying Party shall be liable only for the amounts above the Deductible.  The total aggregate liability of the Sellers under Article VII shall not exceed $182,750 (the "**Cap**"), provided however, the Cap shall not apply to a breach of Fundamental Representations or an action arising from fraud, criminal actions or intentional misconduct.

**Section 7.05 Indemnification Procedures.** To make a claim for indemnification pursuant to this Agreement, an Indemnitee shall notify the Indemnifying Party of its claim in writing as promptly as possible but in no event later than ten (10) days after the Indemnitee becomes aware of such claim.  Such notice by the Indemnitee shall describe the claim in reasonable detail and shall include copies of all material written evidence thereof and indicate the estimated amount, if reasonably practicable, of the Losses that have been or may be sustained by the Indemnitee.  The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure.  The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnitee, to assume the defense of any claim by a third party, at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnitee shall cooperate in good faith in such defense.  In the event that the Indemnifying Party assumes the defense of any third party claim, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal, or make counterclaims pertaining to any such third party claim in the name and on behalf of the Indemnitee.

**Section 7.06 Determination of Losses**.  The parties shall make appropriate adjustments for tax benefits in determining Losses for purposes of this Article VII. Payments by an Indemnifying Party pursuant to Article VII in respect of any Losses shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment actually received by the Buyer in respect of any such claim (net of actual reasonable and documented costs, all applicable taxes, and insurance premium increases incurred in connection with securing such proceeds or payment). For the avoidance of doubt, the Indemnifying Party shall not withhold or otherwise delay payments to the Indemnitee pursuant to Article VII in order to wait for any determination or application of any insurance proceeds.

**Section 7.07 Sole and Exclusive**.  The indemnification provisions in this Article 13 are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any party may have for breach

Ex B- IPA

of representation, warranty, or covenant.

**Section 7.08 Payments.** Once a Loss is agreed to in writing by the Indemnifying Party or finally adjudicated by a final unappealable verdict by a court of competent jurisdiction to be payable pursuant to this Article VII, the Indemnifying Party shall satisfy its obligations within ten (10) business days of such final, non-appealable adjudication by wire transfer of immediately available funds or by agreeing in writing to the offset of the Notes for such amounts.

# ARTICLE VIII
# MISCELLANEOUS

**Section 8.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 8.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses provided by each party (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 8.02**):

**Section 8.03 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify the Agreement so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 8.04 Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in documents to be delivered hereunder, the Exhibits and Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 8.05 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.06 No Third-Party Beneficiaries.** Except as provided in **Article VII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Ex B- IPA

**Section 8.07 Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 8.08 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 8.09 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Montana without giving effect to any choice or conflict of law provision or rule (whether of the State of Montana or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the state courts of the State of Montana, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 8.10 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature Page Follows]*

Ex B- IPA

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Kenneth Krupp **("Buyer")**

By: _____

Name: Kenneth Krupp

Joel Labute **("Sellers")**

By: _____

Name: Joel Labute

By: _____

Name: Gregory Atkinson

Exhibit A
Notes

(As Attached)

Ex B- IPA

Schedule 1.05

Bank Accounts

1. M&T Checking Account #9851733569
2. M&T Credit Card Depository Account #9850180432

Ex B- IPA

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

Schedule 2.05
Financials

Ex B- IPA

**05/16/22**
**Accrual Basis**

# n Race Tours, LLC
# Balance Sheet
### As of April 30, 2022

|                                          | Apr 30, 22 |
|------------------------------------------|-----------:|
| **ASSETS**                               |            |
| **Current Assets**                       |            |
| **Checking/Savings**                     |            |
| **Cash**                                 |            |
| **M&T Checking**                         | 16,811.91  |
| **M&T Credit Card Depository**           | 83,815.04  |
| **Total Cash**                           | 100,626.95 |
| **Petty Cash**                           | 500.00     |
| **Total Checking/Savings**               | 101,126.95 |
| **Other Current Assets**                 |            |
| **Due From FR8 Auctions**                | 59,166.68  |
| **Due From John Cohen**                  | 22,015.00  |
| **Due From NASCAR/Prevost**              | 39,750.00  |
| **Due from SMI**                         | 15,000.00  |
| **Total Other Current Assets**           | 135,931.68 |
| **Total Current Assets**                 | 237,058.63 |
| **Fixed Assets**                         |            |
| **Accumulated Depreciation**             | -580,610.32|
| **Black Stacker Trailer**                | 36,644.08  |
| **Cook Trailer - 2016**                  | 97,088.56  |
| **Forklift**                             | 15,879.00  |
| **Furniture and Equipment**              |            |
| **Backup Cameras**                       | 8,089.76   |
| **Cabinets in staff bus**                | 2,805.93   |
| **Cook Trailer**                         | 20,641.60  |
| **Deck Seating - Swivel Chairs**         | 2,000.00   |
| **Detailing Trailer**                    | 32,724.28  |
| **Generator**                            | 103,100.55 |
| **Golf Cart**                            | 93,854.66  |
| **Mattresses for SC2**                   | 1,730.56   |
| **New Cook Trailer**                     | 13,276.50  |
| **Open Trailer for Carts**               | 2,000.00   |
| **Roofdeck - Entertainer Coach 1**       | 10,220.49  |
| **Roofdeck - Entertainer Coach 2**       | 11,631.82  |
| **Roofdeck - Luxury Ent Coach 4**        | 13,203.09  |
| **Roofdeck - Luxury Hosp Coach 1**       | 9,000.00   |
| **Roofdeck - Luxury Star Coach**         | 13,222.35  |
| **Roofdeck - Luxury Star Coach 3**       | 11,029.60  |
| **Roofdeck - Luxury Star Coach 4**       | 11,398.41  |
| **Roofdeck - Luxury Star Coach 7**       | 10,289.35  |
| **Roofdeck - Luxury Star Coach 8**       | 10,395.00  |
| **Roofdeck - Luxury Star Coach 9**       | 8,719.00   |
| **Roofdeck - Star Coach 2**              | 13,863.78  |

**05/16/22**
**Accrual Basis**

# n Race Tours, LLC
## Balance Sheet
### As of April 30, 2022

|  | Apr 30, 22 |
|---|---:|
| **Shade Canopies** | 35,031.86 |
| **Televisions** | 18,449.16 |
| **Tow Equipment** | |
| **2015 Maroon 2500HD** | 930.00 |
| **Tow Equipment - Other** | 13,318.72 |
| **Total Tow Equipment** | 14,248.72 |
| **Tow Hookup - 2500HD** | 886.00 |
| **Tow Hookup - White Silverado** | 1,276.01 |
| **White Storage Trailer** | 29,555.50 |
| **Furniture and Equipment - Other** | 30,110.34 |
| **Total Furniture and Equipment** | 532,754.32 |
| **Leasehold Improvements** | 11,340.00 |
| **New White Stacker - Flat Front** | 25,250.00 |
| **Renegade Stacker** | 82,000.00 |
| **Total Fixed Assets** | 220,345.64 |
| **Other Assets** | |
| **Organization Costs** | 500.00 |
| **Trademarks** | 549.00 |
| **Total Other Assets** | 1,049.00 |
| **TOTAL ASSETS** | 458,453.27 |

Ex B- IPA

Case 9:24-cv-00038-DWM    Document 12    Filed 03/26/24    Page 21 of 30

05/16/22
Accrual Basis

# h Race Tours, LLC
## Balance Sheet
### As of April 30, 2022

|  | Apr 30, 22 |
|---|---|
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| Due to JAL & JLL, LLC | -141,161.00 |
| Due to Shareholder | 9,243.61 |
| Due to Shareholder - Operating | 132,608.72 |
| Line of Credit - M&T | 24,168.25 |
| Payroll Liabilities | 12,867.00 |
| **Total Other Current Liabilities** | 37,726.58 |
| **Total Current Liabilities** | 37,726.58 |
| **Long Term Liabilities** | |
| Forklift Loan | 11,052.87 |
| **Total Long Term Liabilities** | 11,052.87 |
| **Total Liabilities** | 48,779.45 |
| **Equity** | |
| **Capital Contributions** | |
| Greg Atkinson | 5,000.00 |
| Joel and Jen Labute | 63,375.00 |
| **Total Capital Contributions** | 68,375.00 |
| **Retained Earnings** | 109,316.60 |
| **Net Income** | 231,982.22 |
| **Total Equity** | 409,673.82 |
| **TOTAL LIABILITIES & EQUITY** | 458,453.27 |

Joel Labute

6/22/2022 Date

Ex B- IPA
Page 3 of 3

# n Race Tours, LLC
## Profit & Loss
### January through April 2022

|  | Jan - Apr 22 | Jan - Apr 21 | $ Change |
|---|---|---|---|
| **Ordinary Income/Expense** |  |  |  |
| **Income** |  |  |  |
| **Sales** |  |  |  |
| Atlanta Spring | 35,615.00 | 14,125.00 | 21,490.00 |
| Bristol Spring | 33,550.00 | 60,850.00 | -27,300.00 |
| COTA | 38,322.00 | 0.00 | 38,322.00 |
| Darlington | 30,700.00 | 10,250.00 | 20,450.00 |
| Daytona 500 | 248,661.32 | 131,569.30 | 117,092.02 |
| Daytona Night Race | 2,500.00 | 0.00 | 2,500.00 |
| Dover Spring | 33,223.68 | 0.00 | 33,223.68 |
| Driver Lot Season Leases | 187,313.68 | 180,880.32 | 6,433.36 |
| Fontana | 42,250.00 | 0.00 | 42,250.00 |
| Football Tailgates | 27,324.68 | 0.00 | 27,324.68 |
| Homestead | 0.00 | 12,000.00 | -12,000.00 |
| Indy | 16,500.00 | 19,750.00 | -3,250.00 |
| Kansas Spring | 0.00 | 5,250.00 | -5,250.00 |
| Las Vegas | 45,750.00 | 24,750.00 | 21,000.00 |
| Martinsville Spring | 27,200.00 | 27,250.00 | -50.00 |
| Non-Motorsports Season Leases | 0.00 | 79,166.68 | -79,166.68 |
| Other Coach Leasing | 221,966.68 | 0.00 | 221,966.68 |
| Other Income | 24,250.00 | 102,844.18 | -78,594.18 |
| Phoenix Spring | 37,750.00 | 5,250.00 | 32,500.00 |
| Pocono Summer | 0.00 | 2,500.00 | -2,500.00 |
| Richmond Spring | 29,436.00 | 8,500.00 | 20,936.00 |
| Road America | 3,250.00 | 0.00 | 3,250.00 |
| Rolex 24 Hour | 63,225.00 | 60,700.00 | 2,525.00 |
| Sebring | 40,750.00 | 27,000.00 | 13,750.00 |
| Talladega Fall | 2,000.00 | 2,000.00 | 0.00 |
| Talladega Spring | 173,315.00 | 43,500.00 | 129,815.00 |
| **Total Sales** | 1,364,853.04 | 818,135.48 | 546,717.56 |
| **Total Income** | 1,364,853.04 | 818,135.48 | 546,717.56 |
| **Expense** |  |  |  |
| Bank Service Charges | 0.00 | 131.00 | -131.00 |
| Bus Washing | 11,200.00 | 10,425.45 | 774.55 |
| Charitable Contributions | 5,000.00 | 0.00 | 5,000.00 |
| **Computer and Internet Expenses** |  |  |  |
| Email Maintenance Fees | 644.94 | 0.00 | 644.94 |
| Website Maintenance Fees | 1,200.00 | 1,200.00 | 0.00 |
| Computer and Internet Expenses - Other | 262.31 | 0.00 | 262.31 |
| **Total Computer and Internet Expenses** | 2,107.25 | 1,200.00 | 907.25 |
| Consultant Services | 12,420.00 | 0.00 | 12,420.00 |
| Credit Card Fees | 25,674.39 | 18,162.89 | 7,511.50 |
| **Food & Beverages** |  |  |  |
| Alcoholic Beverages | 656.05 | 0.00 | 656.05 |

05/16/22
Accrual Basis

**n Race Tours, LLC**
**Profit & Loss**
January through April 2022

|  | Jan - Apr 22 | Jan - Apr 21 | $ Change |
|---|---|---|---|
| Food & Beverages - Other | 35,688.81 | 24,409.19 | 11,279.62 |
| **Total Food & Beverages** | 36,344.86 | 24,409.19 | 11,935.67 |
| **Fuel** | 127,112.29 | 83,811.77 | 43,300.52 |
| **GPS Tracking Devices** | 2,468.62 | 2,337.59 | 131.03 |
| **Insurance Expense** |  |  |  |
| 2015 Black 2500 HD | 0.00 | 374.00 | -374.00 |
| 2015 Maroon 2500 HD | 0.00 | 1,365.00 | -1,365.00 |
| Insurance Expense - Other | 12,625.00 | 11,771.07 | 853.93 |
| **Total Insurance Expense** | 12,625.00 | 13,510.07 | -885.07 |
| **Interest Expense** | 947.01 | 23,119.06 | -22,172.05 |
| **Laundry** | 905.19 | 305.04 | 600.15 |
| **Meals and Entertainment** | 11,887.25 | 4,707.39 | 7,179.86 |
| **Office Supplies** | 191.10 | 39.98 | 151.12 |
| **Personal Property Taxes** | 56.00 | 0.00 | 56.00 |
| **Rent Expense** |  |  |  |
| Bus Barn and Parking Grounds | 20,000.00 | 20,000.00 | 0.00 |
| JAL & JLL Coaches |  |  |  |
| Luxury Entertainer Coach 1 | 14,000.00 | 14,000.00 | 0.00 |
| Luxury Entertainer Coach 2 | 14,000.00 | 14,000.00 | 0.00 |
| Luxury Entertainer Coach 3 | 14,000.00 | 14,000.00 | 0.00 |
| Luxury Entertainer Coach 4 | 14,000.00 | 14,000.00 | 0.00 |
| Luxury Executive Coach 2 | 40,000.00 | 40,000.00 | 0.00 |
| Luxury Executive Coach 3 | 46,000.00 | 46,000.00 | 0.00 |
| Luxury Executive Coach 4 | 52,000.00 | 52,000.00 | 0.00 |
| Luxury Executive Coach 5 | 52,000.00 | 0.00 | 52,000.00 |
| Luxury Hospitality Coach 1 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Motorhome 3 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Motorhome 4 | 26,000.00 | 26,000.00 | 0.00 |
| Luxury Motorhome 5 | 0.00 | 20,000.00 | -20,000.00 |
| Luxury Star Coach 1 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Star Coach 10 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Star Coach 2 | 12,000.00 | 12,000.00 | 0.00 |
| Luxury Star Coach 3 | 12,000.00 | 12,000.00 | 0.00 |
| Luxury Star Coach 4 | 12,000.00 | 12,000.00 | 0.00 |
| Luxury Star Coach 5 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Star Coach 7 | 16,000.00 | 16,000.00 | 0.00 |
| Luxury Star Coach 8 | 12,000.00 | 12,000.00 | 0.00 |
| Luxury Star Coach 9 | 12,000.00 | 12,000.00 | 0.00 |
| Rentals in excess of obligation | 0.00 | -160,000.00 | 160,000.00 |
| **Total JAL & JLL Coaches** | 428,000.00 | 236,000.00 | 192,000.00 |
| Non-Owned Coaches |  |  |  |
| Hackett Skydeck | 26,700.00 | 22,000.00 | 4,700.00 |
| Luxury Class A RV 1 | 0.00 | 3,500.00 | -3,500.00 |
| Luxury Class A RV 2 | 3,500.00 | 0.00 | 3,500.00 |

**Profit & Loss**

**January through April 2022**

| | Jan - Apr 22 | Jan - Apr 21 | $ Change |
|---|---|---|---|
| Luxury Class A RV 4 | 5,250.00 | 0.00 | 5,250.00 |
| Luxury Motorhome 1 | 0.00 | 8,000.00 | -8,000.00 |
| Luxury Motorhome 2 | 0.00 | 4,500.00 | -4,500.00 |
| Luxury RV with Racedeck | 5,750.00 | 0.00 | 5,750.00 |
| Total Non-Owned Coaches | 41,200.00 | 38,000.00 | 3,200.00 |
| Subleasing Rental Coaches | 56,500.00 | 0.00 | 56,500.00 |
| Tow Vehicles | | | |
| 2006 Grey 2500HD | 2,400.00 | 2,400.00 | 0.00 |
| 2015 Black 2500HD | 3,600.00 | 3,600.00 | 0.00 |
| Cayenne | 1,646.28 | 1,646.28 | 0.00 |
| Maroon 2500HD | 3,600.00 | 3,600.00 | 0.00 |
| Silverado | 3,600.00 | 3,600.00 | 0.00 |
| White Silverado | 2,400.00 | 2,400.00 | 0.00 |
| Total Tow Vehicles | 17,246.28 | 17,246.28 | 0.00 |
| Total Rent Expense | 562,946.28 | 311,246.28 | 251,700.00 |
| Repairs and Maintenance | | | |
| Golf Cart Repairs | 1,478.67 | 0.00 | 1,478.67 |
| Repairs and Maintenance - Other | 36,100.85 | 26,209.50 | 9,891.35 |
| Total Repairs and Maintenance | 37,579.52 | 26,209.50 | 11,370.02 |
| RV Supplies | | | |
| Linens and Pillows | 728.20 | 2,063.61 | -1,335.41 |
| Total RV Supplies | 728.20 | 2,063.61 | -1,335.41 |
| Satellite Service | 6,569.52 | 11,762.96 | -5,193.44 |
| Sewer Dump Fees | 0.00 | 960.00 | -960.00 |
| Shipping | 45.36 | 1,319.93 | -1,274.57 |
| Telephone Expense | 1,597.77 | 2,186.12 | -588.35 |
| Temp Labor | 138,819.50 | 103,631.98 | 35,187.52 |
| Tickets | | | |
| Infield admission tickets | | | |
| Talladega Spring | 3,250.00 | 0.00 | 3,250.00 |
| Total Infield admission tickets | 3,250.00 | 0.00 | 3,250.00 |
| Pit Passes - NASCAR | 16,750.00 | 5,000.00 | 11,750.00 |
| Pit Passes - Speedways | 7,650.00 | 0.00 | 7,650.00 |
| RV Parking | | | |
| Bristol Spring | 2,750.00 | 10,980.00 | -8,230.00 |
| Charlotte | 2,360.00 | 0.00 | 2,360.00 |
| COTA | 4,569.06 | 0.00 | 4,569.06 |
| Darlington | 972.00 | 1,140.00 | -168.00 |
| Daytona 500 | 40,526.82 | 50,961.50 | -10,434.68 |
| Fontana | 4,450.00 | 0.00 | 4,450.00 |
| Martinsville Spring | 8,300.00 | 1,200.00 | 7,100.00 |
| Phoenix Spring | 6,500.00 | 0.00 | 6,500.00 |
| Richmond Spring | 0.00 | 2,325.00 | -2,325.00 |
| Talladega Fall | 25.00 | 0.00 | 25.00 |

# h Race Tours, LLC
## Profit & Loss
### January through April 2022

|  | Jan - Apr 22 | Jan - Apr 21 | $ Change |
|---|---|---|---|
| Talladega Spring | 9,220.00 | 10,237.00 | -1,017.00 |
| **Total RV Parking** | 79,672.88 | 76,843.50 | 2,829.38 |
| **Tickets - Other** | 500.00 | 0.00 | 500.00 |
| **Total Tickets** | 107,822.88 | 81,843.50 | 25,979.38 |
| **Travel Expense** |  |  |  |
| Air Transportation | 8,559.41 | 3,448.02 | 5,111.39 |
| Cab fees | 417.94 | 251.78 | 166.16 |
| Hotels | 1,418.65 | 3,564.97 | -2,146.32 |
| Tolls | 1,032.07 | 1,731.82 | -699.75 |
| **Total Travel Expense** | 11,428.07 | 8,996.59 | 2,431.48 |
| **Uniforms** | 1,340.24 | 0.00 | 1,340.24 |
| **Utilities** | 10,876.38 | 20,718.43 | -9,842.05 |
| **XM Radio** | 4,178.14 | 712.81 | 3,465.33 |
| **Total Expense** | 1,132,870.82 | 753,811.14 | 379,059.68 |
| **Net Ordinary Income** | 231,982.22 | 64,324.34 | 167,657.88 |
| **Net Income** | 231,982.22 | 64,324.34 | 167,657.88 |

_____  Joel Labute

_____  6/22/2022 Date

Schedule 2.06
Assets

None.

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

Schedule 2.08
IP List

**Trademarks / Tradenames:**

1. Star Coach Race Tours (unregistered)

**Copyrights:** None

**Patents:** None

**Logos:**



**Domain/URLs:**

1. www.starcoachracetours.com

Ex B- IPA

Schedule 2.11
Permits

None.

Ex B- IPA

Schedule 2.13
Contracts

1. William Byron **-** Luxury coach lease agreement
2. Alex Bowman **-** Luxury coach lease agreement
3. Tyler Reddick **-** Luxury coach lease agreement
4. NBC Sports **-** Luxury coach lease agreement
5. Fox Sports **-** Luxury coach lease agreement
6. NASCAR **-** Luxury coach lease agreement
7. Prevost **-** Luxury coach lease agreement
8. Loves **-** Luxury coach lease agreement
9. Smithfield **-** Luxury coach lease agreement

Ex B- IPA

DocuSign Envelope ID: 26307C15-FCDF-42BA-984A-4219815D8A98

### ADDENDUM TO THE INTEREST PURCHASE AGREEMENT

THIS ADDENDUM TO THE INTEREST PURCHASE AGREEMENT (this "**Addendum**"), dated as of August  17  , 2022 ("**Effective Date**"), is to amend Section 1.02 of the Interest Purchase Agreement to represent the agreement and desire of the Sellers to disburse by wire transfer of immediately available funds to accounts designated in advance by Sellers in the following amounts;

Gregory Atkinson          $56,462.50

Joel Labute               $2,438.455.80

The above net amount due to sellers is to reflect the expenses, charges and loan pay-offs as part of the transaction contemplated in the Interest Purchase Agreement.

The Sellers hereby agree that no other interests are to be retained and the amended Section 1.02 properly reflect their agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed as of the date first written above.

DocuSign by:

BEFF91B29F794D6...

Joel Labute

DocuSign by:

Gregory Atkinson
37086A8882D7413...

Gregory Atkinson

1

Ex B- IPA