## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of August 17, 2022 ("**Effective Date**"), by and among BWS ALK LLC, a Montana limited liability company ("**Buyer**"), JAL & JLL, LLC, a Montana limited liability company ("**Seller**") and Joel Labute, the sole member of the Seller and a resident of the State of Florida ("**Owner**").

The purpose of this Agreement is for the Seller and Owner to sell, transfer, convey and deliver unto Buyer all of Seller's and Owner's right, title, and interest, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("**Encumbrance**") the Purchased Assets (as defined below).

**NOW, THEREFORE,** in consideration of Buyer's payment of the Purchase Price and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. **Purchased Assets**. For the Purchase Price set forth below, Seller and Owner hereby irrevocably assign, sell, transfer, convey and deliver to Buyer, free and clear of all liabilities and Encumbrances, and Buyer hereby accepts from Seller and Owner, all of Seller's and Owner's right, title and interest in and to the motor vehicle and other assets set forth on Schedule I (the "**Purchased Assets**").

2. **Excluded Assets**. Notwithstanding the terms and provisions set forth in Section 1 above, Seller shall retain, and Buyer is not acquiring any other assets of the Business or the Seller (collectively the "**Excluded Assets**").

3. **Excluded Liabilities**. Notwithstanding anything herein to the contrary, Buyer is not assuming any liabilities or obligations of any nature whatsoever, whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due and whether related or unrelated to the Purchased Assets, Business, Seller, Owner including any liabilities arising from, related to or in connection with the Excluded Assets (collectively, the "**Excluded Liabilities**").

4. **Purchase Price.** The purchase price (the "**Purchase Price**") for the Purchased Assets shall be One Million Two Hundred and Ninety Five Thousand and No/100 Dollars ($1,295,000). Buyer shall pay the Purchase Price to Seller as follows: (a) at Closing, Buyer shall pay to Seller One Million One Hundred Sixty Five Thousand and no/100 Dollars ($1,165,000) by wire transfer of immediately available funds to an account designated in advance by Seller, and (b) issue promissory note to Seller in the principal amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000) and in the form set forth in Exhibit A. Buyer shall prepare and agree in writing on an allocation of the Purchase Price for and among the Purchased Assets, and Buyer and Seller shall file all tax returns in a manner consistent with the agreed upon allocation schedule.

5. **Prorations**. The operation of the Business and the income and expenses attributable thereto up to the Closing Date shall be for the account of Seller and thereafter for the account of Buyer. Certain expenses mutually agreed to by Seller and Buyer including, without limitation, such items as ad valorem property Taxes shall be prorated between Seller and Buyer as of the Closing Date. Such prorations shall be made and paid insofar as is possible at the Closing, and in any event within thirty (30) days thereafter.

6. **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely via the exchange of documents and signatures simultaneously with the execution of this Agreement, or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing shall be deemed to occur at 12:01 am on the Effective Date or at such other time as Seller and Buyer may mutually agree upon in writing and is herein referred to as the "**Closing Date**".

7. **Closing Deliverables**.

   a. At the Closing, Seller shall deliver to Buyer the following as conditions to Closing: (i) possession of and clear title to the Purchased Assets; (ii) evidence in form and substance reasonably satisfactory to Buyer of the

termination of all Encumbrances of whatever nature relating to the Purchased Assets, if applicable; (iii) executed copies of each of the consents, approvals, or authorizations necessary for the consummation of the transactions set forth herein; (iv) an executed original of the lease to the Seller's garage space for the vehicles in form and substance mutually agreeable to Buyer and Seller ("**Lease**"); (v) the Promissory Note executed by Buyer along with any security related documents; and (vi) all other documents and items that may be reasonably requested by the Buyer in order to consummate the transactions contemplated hereunder.

      b.    At the Closing, Buyer shall deliver to Seller the following as conditions to Closing: (i) the Purchase Price, paid in the manner set forth in Section 4 above; (ii) an executed original of the Lease; (iii) the release of all guarantees and obligations of the Seller and the Owner with respect to any contract and lease which is assumed by Buyer (directly or by entering into a replacement contract or lease with the third party) and (iv) all other documents and items that may be reasonably requested by Seller in order to consummate the transactions contemplated hereunder.

      8.    **Seller Representations and Warranties**. The Seller and the Owner, jointly and severally, represent and warrant to Buyer that the statements contained in this Section 8 are true and correct as of the Closing Date:

      a.    **Due Organization; Authority**.  Seller is a limited liability company duly organized, validly existing, and in good standing in the State of Montana. The execution and delivery by Seller of this Agreement to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller.

      b.    **No Conflicts or Consents**.  The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby and thereby, do not and will not: (i) violate or conflict with any provision of the governing documents of Seller; (b) violate or breach any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement or rule of law of any governmental authority or any order, writ, judgment, injunction, decree, stipulation, or with any governmental authority applicable to Seller or the Purchased Assets; (c) require the consent, notice, declaration or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity ("**Person**") or require any permit, license or governmental order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel any contract to which Seller is a party or by which Seller is bound or to which any of the Purchased Assets are subject; or (e) result in the creation or imposition of any Encumbrance on the Purchased Assets.

      c.    **Title to and Condition of the Purchased Assets.**  Except as set forth on <u>Schedule 8(c)</u>, Seller owns good and marketable title in fee simple to the Purchased Assets, free and clear of all other claims of ownership, leases, licenses, easements, liens, Encumbrances, charges, security interests, conditions and restrictions.  For purposes of this Agreement, **"Encumbrance"** means any mortgage, pledge, lien, encumbrance, charge, or other security interest. The Purchased Assets are in good condition and repair, with the exception of ordinary wear and tear, and are adequate for the uses to which same is being put, and none is in need of repair other than ordinary, routine maintenance that are not material in nature or cost.

      d.    **Legal Proceedings; Governmental Orders**. There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or to the actual knowledge of the Seller threatened against or by Seller: (i) relating to or affecting the Seller, the Purchased Assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. Seller is in compliance in all material respects with all governmental orders against, relating to or affecting the business or the Purchased Assets.

      e.    **Compliance with Laws**. To the actual knowledge of the Seller is in compliance in all material respects with all statutes, laws, ordinances, regulations, rules, codes, treaties, or other requirements of any governmental authority applicable to Seller or the Purchased Assets.

   f.  **Taxes**. All taxes due and owing by Seller related to the Seller and the Purchased Assets have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller related to the Seller. All Tax returns with respect to the Seller required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed. Such Tax returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

   g.  **Brokers.** Except for Quest M&A, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

   h.  **No Other Representations and Warranties**. Except for the representations and warranties contained in this Section 8 (including the related portions of the Disclosure Schedules), neither Seller and Owner nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Assets furnished or made available to Buyer and its Representatives (including any information, documents or material delivered to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

  9.  **Buyer Representations and Warranties** Buyer represents and warrants to Seller and to Owner as of the Effective Date and as of the Closing Date as follows:

   a.  **Due Organization; Authority**. Buyer is a limited liability company duly organized, validly existing, and in good standing in the State of Montana. Ken Krupp is the sole owner of the Buyer. The execution and delivery by Buyer of this Agreement to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Buyer.

   b.  **No Conflicts or Consents**. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby and thereby, do not and will not: (i) violate or conflict with any provision of the governing documents of Buyer; (b) violate or breach any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement or rule of law of any governmental authority or any order, writ, judgment, injunction, decree, stipulation, or with any governmental authority applicable to Buyer or the Purchased Assets; (c) require the consent, notice, declaration or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity ("**Person**") or require any permit, license or governmental order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which Buyer is bound or to which any of the Purchased Assets are subject; or (e) result in the creation or imposition of any Encumbrance on the Purchased Assets.

   c.  **Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

   d.  **No Other Representations and Warranties**. Except for the representations and warranties contained in this Section 9**,** neither Buyer nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Buyer, including any representation or warranty as to the accuracy or completeness of any information set forth herein.

Ex C- APA

10. **Taxes**. The Seller will be liable for and will pay all Taxes applicable to the Business or the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Except as provided in this Section 11, all Taxes levied with respect to the Purchased Assets for any taxable year that includes the day before the Closing Date and ends on or after the Closing Date, whether imposed or assessed before or after the Closing Date, will be prorated between the Seller and the Buyer as of the Closing Date. If any Taxes subject to proration are paid by the Buyer, on the one hand, or the Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) will be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

11. **Public Announcements**. Unless otherwise required by applicable law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby, or disclose to any Person the content or terms of this Agreement, provided the parties shall reasonably agree as to the language of an announcement after the Closing Date.

12. **Further Assurances**. Following the Closing, each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the related transaction documents set forth in this Agreement.

13. **Indemnification**.

   a. **Survival of Representations and Warranties**. All of the representations, warranties, covenants and agreements made by the parties shall survive the Closing for a period of one (1) year; *provided however*, that (i) the representations, warranties, covenants and agreements in 8.a through f. shall survive until sixty (60) days following the expiration of the applicable statute of limitations (collectively, the "**Fundamental Representations**"), and all claims related to fraud criminal actions or intentional misconduct shall survive indefinitely.

   b. **Buyer Indemnification**. Subject to the other terms and conditions of this Section 13, Seller and the Owner, jointly and severally (the "**Seller Indemnifying Party**") shall indemnify and defend Buyer and its officers, members, managers, employees, agents and representatives ("**Representatives**") (Buyer and its Representatives collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, actual out-of-pocket costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers ("**Losses**") incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of or with respect to: (i) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; (iii) any Excluded Liability; and (iv) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller conducted, existing or arising on or prior to the Closing Date.

   c. <u>Seller Indemnification</u>. Subject to the other terms and conditions of this Section 13, Buyer ("**Buyer Indemnifying Party**") shall indemnify and defend Seller and its Representatives (Seller and its Representatives collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of or with respect to: (i) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; and (iii) any third party claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Buyer conducted, existing or arising after the Closing Date.

   d. **Limitations.** Except as to the Fundamental Representations and for any claims arising from Fraud or intentional misconduct, no Indemnifying Party shall be liable to the Indemnified Party until the amount of all Losses in respect to an indemnified claim under this Section 13 exceeds $5,000 (the "**Deductible**"), in which case the Indemnifying Party shall be liable only for the amounts above the Deductible. The total aggregate liability of the Seller

under Section 13 shall not exceed $64,750 (the "**Cap**"), provided however, the Cap shall not apply to a breach of Fundamental Representations or an action arising from fraud, criminal actions or intentional misconduct.

      e.    **Indemnification Procedures.** To make a claim for indemnification pursuant to this Agreement, an Indemnitee shall notify the Indemnifying Party of its claim in writing as promptly as possible but in no event later than ten (10) days after the Indemnitee becomes aware of such claim. Such notice by the Indemnitee shall describe the claim in reasonable detail and shall include copies of all material written evidence thereof and indicate the estimated amount, if reasonably practicable, of the Losses that have been or may be sustained by the Indemnitee. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnitee, to assume the defense of any claim by a third party, at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnitee shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any third party claim, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal, or make counterclaims pertaining to any such third party claim in the name and on behalf of the Indemnitee.

      f.    **Determination of Losses**. The parties shall make appropriate adjustments for tax benefits in determining Losses for purposes of this Section 13. Payments by an Indemnifying Party pursuant to Section 13 in respect of any Losses shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment actually received by the Buyer in respect of any such claim (net of actual reasonable and documented costs, all applicable taxes, and insurance premium increases incurred in connection with securing such proceeds or payment). For the avoidance of doubt, the Indemnifying Party shall not withhold or otherwise delay payments to the Indemnitee pursuant to Section 13 in order to wait for any determination or application of any insurance proceeds.

      g.    **Sole and Exclusive**. The indemnification provisions in this Article 13 are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any party may have for breach of representation, warranty, or covenant.

      h.    **Payments.** Once a Loss is agreed to in writing by the Indemnifying Party or finally adjudicated by a final unappealable verdict by a court of competent jurisdiction to be payable pursuant to this Section 13, the Indemnifying Party shall satisfy its obligations within ten (10) business days of such final, non-appealable adjudication by wire transfer of immediately available funds or agreeing in writing to the offset of the Promissory Notes for such amounts.

    **14.**    **Notices**. All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses provided by each party.

    **15.**    **Miscellaneous.** The validity, interpretation and construction of this Agreement, and any issue relating to the enforcement of this Asset Purchase Agreement, shall be governed by the laws of the state of Montana, without reference to its principles of conflicts of law. Subject to all of the terms and conditions hereof, this Agreement inures to the benefit of and is binding upon the parties hereto and their successors and assigns. No delay or omission on the part of either party in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement. If any provision of this Agreement is held to be invalid, the remainder of the provisions shall be given full force and effect. This Agreement constitutes the entire agreement and understanding between parties concerning the subject matter hereof, and cancels, terminates and supersedes all prior written and oral understandings, agreements, proposals, promises and representations of the parties respecting any and all subject matter contained herein. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which

Ex C- APA

DocuSign Envelope ID: E6FFA262-3985-4CB4-8681-B0E011CB7019

together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights, and this Agreement does not confer any such rights, upon any other Person other than the parties hereto. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy

Ex C- APA

**IN WITNESS WHEREOF**, the parties have executed this Asset Purchase Agreement effective as of the Closing Date.

BWS ALK LLC **("Buyer")**                                   JAL & JLL, LLC **("Seller")**

By: _[signature]_____                              By: _[signature]_____

Name: Kenneth Krupp                                          Name: Joel Labute
Title: Manager                                               Title: Manager

                                                        **OWNER**

                                                        By: _[signature]_____
                                                            Joel Labute, individually

Ex C- APA

Schedule I
List of Equipment to be acquired

Luxury Star Coach 5
Luxury Hospitality Coach 1
Luxury Entertainer Coach 2
Luxury Entertainer Coach 4
White ATC Stacker Trailer
Black ATC Stacker Trailer
White Continental Cargo Stacker Trailer
Cook Trailer
200KW Generator Trailer
Wash and Detail Trailer
Storage Trailer
White Silverado 1500
Grey Silverado 2500
Black Silverado 2500HD
Golf Carts
Large Corporate Hospitality Setup
General Hospitality Items

Ex C- APA

Schedule 8(c)
Liens

1. IncredibleBank

Ex C- APA